BEATTY, Justice.
Plaintiff, Thekla Holley Parker, as ad-ministratrix of the estate of Ellen Holley, appeals from a judgment based upon a jury verdict in favor of defendant, Baptist Home for Senior Citizens (Baptist Home), a corporation. We affirm.
The sole issue presented to this Court is whether or not the trial court erred in denying plaintiff’s motion for a new trial. According to plaintiff, the great weight and preponderance of the evidence was so against the jury verdict as to mandate a new trial.
The case was initiated by plaintiff’s complaint seeking damages for the wrongful death of plaintiff’s mother, Ellen Holley, as well as damages for breach of contract. The gist of plaintiff’s claims was that defendant breached its duty of care to Mrs. Holley by causing her, through malnutrition, to become ill and subsequently to die.
The evidence established that Mrs. Holley, a woman in her mid-seventies, had lived with her daughter, Thekla, from September 1977 to late March 1978, as a well person who was able to do light housework. Reports from routine office checkups by her physician, Dr. Nancy Sawyer, during this period showed Mrs. Holley to have been a woman weighing 158 pounds and wearing a size 18 dress. No medical problems causing any severe distress were noted during this particular period, although her previous medical history included gallbladder surgery, a stroke, hypertension, colon problems, and hardening of the arteries. Indeed, Mrs. Holley had been hospitalized in December 1977, after periods of confusion, lethargy, and physical weakness. Hospital examination revealed extreme diverticulosis. A subsequent period of hospitalization revealed degenerative brain changes and cortical atrophy.
In February 1978, Mrs. Holley’s condition required that she have the assistance of others in order to bathe or attend to other personal needs. She was ambulatory but lethargic when admitted to the Baptist Home on March 28, 1978. The registered nurse who completed a cumulative diagnosis of her condition at or near that time said she remembered her being of average height and weight, her weight being between 120 and 130 pounds.
Upon her admission to the Baptist Home, Mrs. Holley became ill, and her physician, Dr. Sawyer, ordered that she be hospitalized. On April 4, 1978, she was diagnosed • *396 as very ill, very lethargic, with an infection of the urinary tract, and with low blood pressure. Urinalysis revealed a large number of white cells and bacteria in the protein. Her urinary tract infection had caused generalized sepsis. According to Dr. Sawyer, Mrs. Holley’s weight at that time was estimated at about 145 pounds. She was placed in the intensive care unit because of symptoms of a heart attack. Although the tests there did not clearly disclose a heart attack, they did indicate ischemic heart disease. During this period of hospitalization, she lost approximately ten pounds. In any case, her health had deteriorated when she was discharged from the hospital and returned to the Baptist Home on April 17, 1978, in a bedridden condition. From that time, Mrs. Holley’s condition progressively worsened. A number of techniques were used to feed her, including feeding by syringe. Indeed, the record of her stay at the Baptist Home from March 1978 contains references to the Baptist Home’s staff plan to encourage her to eat.
Nevertheless, on October 31, 1978, illness again required hospitalization for Mrs. Holley. She was severely dehydrated, suffered marked flexion contractures of all extremities, and was also suffering severe malnutrition. Her condition continued to decline. Although X-rays made the day after her admission showed her lungs to be clear, those made about two weeks later showed pneumonia. Her weight also dropped during this period of hospitalization. On November 20, 1978, Mrs. Holley weighed 95 xk pounds. Two days later, her weight had dropped to 92 lk pounds. On November 27, 1978, her weight was down to 86 pounds. Even so, during this period of hospitalization, Mrs. Holley began to eat voluntarily and gained weight. Her condition so improved that she was moved to Northway Nursing Home on December 5, 1978. However, she died on December 8, 1978. The immediate cause of her death as given on the certificate of death by Dr. Sawyer was “probable pneumonia” as a consequence of severe malnutrition due to or as a consequence of “chronic brain syndrome.” The treating physician at North-way Nursing Home, however, listed the cause of death as organic brain syndrome.
Plaintiff’s theory throughout the case was that the severe malnutrition would not have occurred had there been reasonable and acceptable nursing care six months prior to Mrs. Holley’s October hospitalization.
The evidence on a state of malnutrition in Mrs. Holley while at the Baptist Home was divided. Indeed, it is not clear that any significant weight loss occurred at the Baptist Home before Mrs. Holley’s first period of hospitalization. Although the amount of her weight was not recorded on the Baptist Home’s permanent record, the evidence for the defendant did establish that her initial admission weight was taken and kept at the nurse’s control desk. When she was removed shortly thereafter for her first period of hospitalization, the clinical summary made by Dr. Sawyer stated:
“This 77 year old white female was admitted because of acute onset of confusion, diarrhea, weakness. She also complained recently of shortness of breath. The patient had been in the Nursing Home for several weeks. Prior to this she had been evaluated here at which time her workup was consistent with chronic brain syndrome. Also revealed diverticulosis and hiatal hernia. The patient also has a history of having had at least 2 cerebrovascular accidents. Family denies however, any recent seizures, motor or speech impairment.
“Physical examination revealed a temperature of 97, blood pressure 80/60 lying, pulse 60. The patient was pale, lethargic, white female with intermittent Cheyne-Stokes respiration. Mucous membranes were dry. Fundi revealed Grade II hypertensive changes. Chest was clear to A & P. Heart — normal sinus rhythm with a Grade II/VI systolic ejection murmur at apex along left ster-nal border. Pelvic revealed apparently cystocele and rectocele. No adnexal masses. Neurological — the patient was *397 disoriented intermittently. She was very lethargic. However, there were no motor or sensory deficits.
[[Image here]]
“Hospital course — the patient was initially treated with intravenous fluids as it was felt that she was partially dehydrated on admission. She was also started on intravenous antibiotics consisting of Keflin and Gentamycin. Lumbar puncture was done which was normal. She continued however, to be extremely disoriented and two days after admission was transferred to the Coronary Care Unit because of an acute episode of shortness of breath and chest pain. She was seen there in consultation by Dr. Prather who suggested that she be placed on Isordil. He felt that she had ischemic heart disease probably secondary to poor coronary perfusion. He also felt that this had led to some element of left ventricular failure. The patient was monitored in the CCU for two days. There were no serial EKG or cardiac enzyme changes and she was transferred back to a regular floor. She continued to be disoriented but was hemodynamically stable. At time of discharge her urinalysis had cleared except for the presence of a large amount of yeast. Her blood pressure, electrocardiogram, and renal and liver function tests were stable. Her condition was discussed with her family and it was recommended that she be transferred back to ... Nursing Home.”
This record refers to partial dehydration, but does not refer to weight loss. Nor is there any clear evidence of the cause of the weight loss between the time of Mrs. Holley’s visit to Dr. Sawyer’s office on November 4, 1977, when she weighed 158 pounds, and her first admission to the Baptist Home on March 28, 1978, when her weight was estimated to be about 120 pounds. In that interval, Mrs. Holley had been hospitalized twice and had visited her physician’s office several times. Mrs. Holley’s granddaughter, who visited her weekly, noticed no change in heir grandmother’s weight between April and October 1978, although she attributed this to the fact that Mrs. Holley wore long sleeves on her nightgowns and would be in bed with a bedcover over her upper body.
The Baptist Home staff, according to the record, noted Mrs. Holley’s loss of appetite, and administered B-12 injections to stimulate her appetite, and she was also fed with a syringe, as noted before. A physician, Dr. John Haynes, testified that based upon a review of the tests made upon Mrs. Holley at Carraway Methodist Hospital on October 31, 1978, she had been taking enough nourishment to maintain bodily functions.
Upon her second hospitalization, the hospital clinical summary included these pertinent observations:
“Patient is a 77 year old white female, resident of nursing home since April, 1978 with previous problems being organic brain syndrome and a history of congestive heart failure. There was minimal subjective data available at the time of admission, but she had not been doing well in her nursing home, apparently refusing food and not taking p.o. fluids. The implications at the time of admission were that there had been no sudden, acute change in her condition, but her gradual constitutional decline had reached a point of concern.
[[Image here]]
“Clinical course: The patient was admitted to a regular floor with the impression of general volume deficit, largely free water aggravated by fevers and poor p.o. intake over a considerable period of time, protein-calorie malnutrition and urinary tract infection. It is recognized that she had a history of coronary artery disease and had probable ischemic cardiomyopathy. Patient was begun on IV fluids as well as intravenous Ampicil-lin. Fever responded well to this therapy and urine actually cleared, although we were unable to culture an organism at the time of admission. Electrolytes corrected without problems and the BUN ultimately decreased to 14. MB Bands were collected because of the EKG changes and they were negative. Vita *398 min and protein calorie supplementation was begun and the patient seemed to respond with some increasing strength and was sent to Physical Therapy. She did respond to that in an encouraging way. She developed a low grade fever around 11/14/78. Chest X-ray revealed that there was some atelectasis and probably pneumonitis involved at that time. She was begun on pulmonary physiotherapy as well as p.o. Erythromycin and she defervesced. In spite of reasonable p.o. intake and dietary supplementation with Sustacal, patient continued to lose weight. She had one episode of hema-tochezia during the period she was in the hospital and a barium enema was done which revealed scattered diverticuli. An upper GI with barium swallow was obtained to rule out esophageal strictures and only a small hiatal hernia was noted with a very small diverticulum. At a point in which the patient was doing reasonably well with her weight up to 99 ¾ pounds and her electrolytes in good balance, she was allowed to be transferred to the nursing home.... ”
It bears repeating that the attending physician at the Northway Nursing Home, where Mrs. Holley died, determined the cause of death to be organic brain syndrome, a condition expressly noted at her first hospital admission. Although Dr. Sawyer stated that death was due to pneumonia, she conceded that an autopsy, which was not performed, would have been important in lending medical certainty as to the cause of death.
Insofar as it was urged by plaintiff that Mrs. Holley's malnutrition caused her to develop pneumonia, the evidence also tends to establish that any alleged malnutrition was remedied by her hospitalization. In fact, the evidence warrants the conclusion that Mrs. Holley did not have pneumonia when tested at Carraway Methodist Hospital on November 1, but when tested there two weeks later she did have that disease.
Under the evidence, the cause of Mrs. Holley’s death clearly was one for the jury, which, under that evidence, could have found that Mrs. Holley’s progressive decline in health and ultimate death were caused by chronic or organic brain syndrome rather than from any act of negligence on the part of the Baptist Home.
In Edmonson v. Blakey, 341 So.2d 481, 485 (Ala.1976), this Court pronounced the well established rule: “[Wjhere evidence is presented which, if believed, supports the verdict, a motion for a new trial on the ground that the verdict is against the evidence may be properly denied.”
Let the judgment be affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, AL-MON and HOUSTON, JJ., concur.